# EXHIBIT D

**TRANSACTIS, INC.**

**2003 EQUITY INCENTIVE PLAN**

**Adopted: March 26, 2003**
**Termination Date: March ___, 2013**

1) **PURPOSES.**

   a) **Eligible Stock Award Recipients.**  The persons eligible to receive Stock Awards are the Employees, Directors and Consultants of the Company and its Affiliates.

   b) **Available Stock Awards.**  The purpose of the Plan is to provide a means by which eligible recipients of Stock Awards may be given an opportunity to benefit from increases in value of the Common Stock through the granting of the following Stock Awards:  (i) Incentive Stock Options, (ii) Nonstatutory Stock Options, (iii) stock bonuses and (iv) rights to acquire restricted stock.

   c) **General Purpose and Establishment.**  The Company, by means of the Plan, seeks to retain the services of the group of persons eligible to receive Stock Awards, to secure and retain the services of new members of this group and to provide incentives for such persons to exert maximum efforts for the success of the Company and its Affiliates.

2) **DEFINITIONS.**

   a) *"Affiliate"* means any parent corporation or subsidiary corporation of the Company, whether now or hereafter existing, as those terms are defined in Sections 424(e) and (f), respectively, of the Code.

   b) *"Board"* means the Board of Directors of the Company.

   c) *"Cause"* means if Participant is subject to a written employment agreement with the Company in which the term "Cause" is specifically defined, the term shall have the same meaning for purposes of this Plan.  In all other instances, "Cause" shall mean (i) Participant's failure to perform duties consistent with his or her position; (ii) indictment or conviction of a felony or any other crime involving moral turpitude or dishonesty; (iii) failure or refusal to comply with Company policies, standards or regulations; (iv) conduct by the Participant that demonstrates gross unfitness to serve in the capacity in which the Participant is serving at the time of such conduct; (v) material violation of any agreement with the Company (including, but not limited to, any proprietary information, inventions, non-solicitation and/or non-competition agreements with the Company) or of any

statutory duty to the Company; or (vi) the Participant's willful dishonesty, fraud, or misconduct with respect to the business or affairs of the Company.

d) **"Code"** means the Internal Revenue Code of 1986, as amended.

e) **"Committee"** means a committee of one or more members of the Board appointed by the Board in accordance with subsection 3(c).

f) **"Common Stock"** means the common stock of the Company.

g) **"Company"** means Transactis, Inc., a Delaware corporation.

h) **"Consultant"** means any person, including an advisor engaged by the Company or an Affiliate to render consulting or advisory services and who is compensated for such services.

i) **"Continuous Service"** means that the Participant's service with the Company or an Affiliate, whether as an Employee, Director or Consultant, is not interrupted or terminated. The Participant's Continuous Service shall not be deemed to have terminated merely because of a change in the capacity in which the Participant renders service to the Company or an Affiliate as an Employee, Consultant or Director or a change in the entity for which the Participant renders such service, provided that there is no interruption or termination of the Participant's Continuous Service. For example, a change in status from an Employee of the Company to a Consultant of an Affiliate or a Director will not constitute an interruption of Continuous Service. The Board, in that party's sole discretion, may determine whether Continuous Service shall be considered interrupted in the case of any leave of absence approved by that party, including sick leave, military leave or any other personal leave.

j) **"Covered Employee"** means the chief executive officer and the four (4) other highest compensated officers of the Company for whom total compensation is required to be reported to shareholders under the Exchange Act, as determined for purposes of Section 162(m) of the Code.

k) **"Director"** means a member of the Board of Directors of the Company.

l) **"Disability"** means the permanent and total disability of a person within the meaning of Section 22(e)(3) of the Code.

m) **"Employee"** means any person employed by the Company or an Affiliate. Mere service as a Director or payment of a director's fee by the Company or an Affiliate shall not be sufficient to constitute "employment" by the Company or an Affiliate.

n) **"Exchange Act"** means the Securities Exchange Act of 1934, as amended.

o) **"*Fair Market Value*"** means, as of any date, the value of the Common Stock determined as follows:

  i) If the Common Stock is listed on any established stock exchange or traded on the Nasdaq National Market or the Nasdaq SmallCap Market, the Fair Market Value of a share of Common Stock shall be the closing sales price for such stock (or the closing bid, if no sales were reported) as quoted on such exchange or market (or the exchange or market with the greatest volume of trading in the Common Stock) on the last market trading day prior to the day of determination, as reported in *The Wall Street Journal* or such other source as the Board deems reliable.

  ii) In the absence of such markets for the Common Stock, the Fair Market Value shall be determined in good faith by the Board.

p) **"*Good Reason*"** shall mean (i) reduction of a Participant's rate of Compensation as in effect immediately prior to a Change in Control by greater than ten percent (10%) without the Participant's prior written consent, except to the extent such reduction is part of a general reduction of Compensation affecting all or substantially all employees of the Company or affecting all or substantially all employees at the same level as the Participant; (ii) a material reduction of a Participant's job duties, powers or responsibilities to a level below that which would ordinarily be assigned to an employee at the Participant's level without his or her prior written consent (but not merely a change in title or reporting relationships), provided that an assignment of specific duties and functions of a Participant to someone else as a result of Company growth and/or reorganization of the business shall not, by itself, constitute "Good Reason" unless in the aggregate there has been a material reduction of the Participant's job functions; (iii) a relocation of the Participant's principal work site on other than a temporary basis to a location that is more than fifty (50) miles away from his or her principal work site at the time of the Change in Control, unless the new location is the same distance or closer to the Participant's personal residence; or (iv) a failure or refusal of any successor company to assume the obligations of the Company under an agreement with a Participant, or a material breach by the successor company of any of the material provisions of an agreement with such Participant. The term "Compensation" as used herein refers to a Participant's base salary, as well as any bonus or commission that the Participant is eligible to receive upon the attainment of performance goals or otherwise. The term "Change in Control" as used herein is as described in Section 11 hereof.

q) **"*Incentive Stock Option*"** means an Option intended to qualify as an incentive stock option within the meaning of Section 422 of the Code and the regulations promulgated thereunder.

r) **"*Listing Date*"** means the first date upon which any security of the Company is listed (or approved for listing) upon notice of issuance on any securities exchange or designated (or approved for designation) upon notice of issuance as a national market security on an interdealer quotation system.

s) *"Non-Employee Director"* means a Director who either (i) is not a current Employee or Officer of the Company or its parent or a subsidiary, does not receive compensation (directly or indirectly) from the Company or its parent or a subsidiary for services rendered as a consultant or in any capacity other than as a Director (except for an amount as to which disclosure would not be required under Item 404(a) of Regulation S-K promulgated pursuant to the Securities Act ("Regulation S-K"), does not possess an interest in any other transaction as to which disclosure would be required under Item 404(a) of Regulation S-K and is not engaged in a business relationship as to which disclosure would be required under Item 404(b) of Regulation S-K; or (ii) is otherwise considered a "non-employee director" for purposes of Rule 16b-3.

t) *"Nonstatutory Stock Option"* means an Option not intended to qualify as an Incentive Stock Option.

u) *"Officer"* means (i) before the Listing Date, any person designated by the Company as an officer and (ii) on and after the Listing Date, a person who is an officer of the Company within the meaning of Section 16 of the Exchange Act and the rules and regulations promulgated thereunder.

v) *"Option"* means an Incentive Stock Option or a Nonstatutory Stock Option granted pursuant to the Plan.

w) *"Option Agreement"* means a written agreement between the Company and an Optionholder evidencing the terms and conditions of an individual Option grant. Each Option Agreement shall be subject to the terms and conditions of the Plan.

x) *"Optionholder"* means a person to whom an Option is granted pursuant to the Plan or, if applicable, such other person who holds an outstanding Option.

y) *"Outside Director"* means a Director who either (i) is not a current employee of the Company or an "affiliated corporation" (within the meaning of Treasury Regulations promulgated under Section 162(m) of the Code), is not a former employee of the Company or an "affiliated corporation" receiving compensation for prior services (other than benefits under a tax qualified pension plan), was not an officer of the Company or an "affiliated corporation" at any time and is not currently receiving direct or indirect remuneration from the Company or an "affiliated corporation" for services in any capacity other than as a Director or (ii) is otherwise considered an "outside director" for purposes of Section 162(m) of the Code.

z) *"Participant"* means a person to whom a Stock Award is granted pursuant to the Plan or, if applicable, such other person who holds an outstanding Stock Award.

aa) *"Plan"* means this Transactis , Inc. 2003 Equity Incentive Plan.

bb) *"Rule 16b-3"* means Rule 16b-3 promulgated under the Exchange Act or any successor to Rule 16b-3, as in effect from time to time.

cc) *"Securities Act"* means the Securities Act of 1933, as amended.

dd) *"Stock Award"* means any right granted under the Plan, including an Option, a stock bonus and a right to acquire restricted stock.

ee) *"Stock Award Agreement"* means a written agreement between the Company and a holder of a Stock Award evidencing the terms and conditions of an individual Stock Award grant. Each Stock Award Agreement shall be subject to the terms and conditions of the Plan.

ff) *"Stockholders' Agreement"* means the written Stockholders' Agreement dated January 31, 2002 by and between Transactis, Inc. and the stockholders on the signature pages thereto, as such Stockholders' Agreement may be amended from time to time, and any successor thereto.

gg) *"Ten Percent Shareholder"* means a person who owns (or is deemed to own pursuant to Section 424(d) of the Code) stock possessing more than ten percent (10%) of the total combined voting power of all classes of stock of the Company or of any of its Affiliates.

3) **ADMINISTRATION.**

a) **Administration by Board.** The Board shall administer the Plan unless and until the Board delegates administration to a Committee, as provided in subsection 3(c).

b) **Powers of Board.** The Board shall have the power, subject to, and within the limitations of, the express provisions of the Plan:

i) To determine from time to time which of the persons eligible under the Plan shall be granted Stock Awards; when and how each Stock Award shall be granted; what type or combination of types of Stock Award shall be granted; the provisions of each Stock Award granted (which need not be identical), including the time or times when a person shall be permitted to receive Common Stock pursuant to a Stock Award; and the number of shares of Common Stock with respect to which a Stock Award shall be granted to each such person.

ii) To construe and interpret the Plan and Stock Awards granted under it, and to establish, amend and revoke rules and regulations for its administration. The Board, in the exercise of this power, may correct any defect, omission or inconsistency in the Plan or in any Stock Award Agreement, in a manner and to the extent it shall deem necessary or expedient to make the Plan fully effective.

iii) To amend the Plan or a Stock Award as provided in Section 12.

iv) Generally, to exercise such powers and to perform such acts as the Board deems necessary or expedient to promote the best interests of the Company which are not in conflict with the provisions of the Plan.

c) **Delegation to Committee.**

    i) **General.** The Board may delegate administration of the Plan to a Committee or Committees of one (1) or more members of the Board, and the term "Committee" shall apply to any person or persons to whom such authority has been delegated. If administration is delegated to a Committee, the Committee shall have, in connection with the administration of the Plan, the powers theretofore possessed by the Board, including the power to delegate to a subcommittee any of the administrative powers the Committee is authorized to exercise (and references in this Plan to the Board shall thereafter be to the Committee or subcommittee), subject, however, to such resolutions, not inconsistent with the provisions of the Plan, as may be adopted from time to time by the Board. The Board may abolish the Committee at any time and revest in the Board the administration of the Plan.

    ii) **Committee Composition when Common Stock is Publicly Traded.** At such time as the Common Stock is publicly traded, in the discretion of the Board, a Committee may consist solely of two or more Outside Directors, in accordance with Section 162(m) of the Code, and/or solely of two or more Non-Employee Directors, in accordance with Rule 16b-3. Within the scope of such authority, the Board or the Committee may (1) delegate to a committee of one or more members of the Board who are not Outside Directors the authority to grant Stock Awards to eligible persons who are either (a) not then Covered Employees and are not expected to be Covered Employees at the time of recognition of income resulting from such Stock Award or (b) not persons with respect to whom the Company wishes to comply with Section 162(m) of the Code or (2) delegate to a committee of one or more members of the Board who are not Non-Employee Directors the authority to grant Stock Awards to eligible persons who are not then subject to Section 16 of the Exchange Act.

d) **Effect of Board's Decision.** All determinations, interpretations and constructions made by the Board in good faith shall not be subject to review by any person and shall be final, binding and conclusive on all persons.

e) **Indemnification.** To the maximum extent permitted by law and by the Company's charter and by-laws, the members of the Board or Committee charged with administering the Plan shall be indemnified by the Company in respect of all their activities under the Plan.

4) **SHARES SUBJECT TO THE PLAN.**

a) **Share Reserve.** Subject to the provisions of Section 11 relating to adjustments upon changes in Common Stock, the Common Stock that may be issued pursuant to Stock Awards shall not exceed in the aggregate One Million Two Hundred Four Thousand Eight Hundred Nineteen (1,204,819) shares of Common Stock.

b) **Reversion of Shares to the Share Reserve.** If any Stock Award shall for any reason expire or otherwise terminate, in whole or in part, without having been exercised in full,

the shares of Common Stock not acquired under such Stock Award shall revert to and again become available for issuance under the Plan. Notwithstanding the foregoing, any shares of Common Stock, purchased pursuant to the exercise of an Option, that are surrendered to or repurchased by the Company after the exercise but before such shares are vested, shall become available again for issuance under the Plan pursuant to Stock Awards; provided, however, that such shares shall not be made available for purchase pursuant to any Incentive Stock Option.

c) **Source of Shares.** The shares of Common Stock subject to the Plan may be unissued shares or reacquired shares, bought on the market or otherwise.

5) **ELIGIBILITY.**

a) **Eligibility for Specific Stock Awards**. Incentive Stock Options may be granted only to Employees. Stock Awards other than Incentive Stock Options may be granted to Employees, Directors and Consultants.

b) **Ten Percent Shareholders.** A Ten Percent Shareholder shall not be granted an Incentive Stock Option unless the exercise price of such Option is at least one hundred ten percent (110%) of the Fair Market Value of the Common Stock at the date of grant and the Option is not exercisable after the expiration of five (5) years from the date of grant.

c) **Section 162(m) Limitation.** Subject to the provisions of Section 11 relating to adjustments upon changes in the shares of Common Stock, no Employee shall be eligible to be granted Options exceeding the equivalent of $1,000,000 worth of shares of Common Stock during any calendar year. This subsection 5(c) shall not apply prior to the Listing Date and, following the Listing Date, this subsection 5(c) shall not apply until (i) the earliest of: (1) the first material modification of the Plan (including any increase in the number of shares of Common Stock reserved for issuance under the Plan in accordance with Section 4); (2) the issuance of all of the shares of Common Stock reserved for issuance under the Plan; (3) the expiration of the Plan; or (4) the first meeting of shareholders at which Directors are to be elected that occurs after the close of the third calendar year following the calendar year in which occurred the first registration of an equity security under Section 12 of the Exchange Act; or (ii) such other date required by Section 162(m) of the Code and the rules and regulations promulgated thereunder.

d) **Consultants.**

i) Prior to the Listing Date, a Consultant shall not be eligible for the grant of a Stock Award if, at the time of grant, either the offer or the sale of the Company's securities to such Consultant is not exempt under Rule 701 of the Securities Act ("Rule 701") because of the nature of the services that the Consultant is providing to the Company, or because the Consultant is not a natural person, or as otherwise provided by Rule 701, unless the Company determines that such grant need not comply with the

requirements of Rule 701 and will satisfy another exemption under the Securities Act as well as comply with the securities laws of all other relevant jurisdictions.

ii) From and after the Listing Date, a Consultant shall not be eligible for the grant of a Stock Award if, at the time of grant, a Form S-8 Registration Statement under the Securities Act ("Form S-8") is not available to register either the offer or the sale of the Company's securities to such Consultant because of the nature of the services that the Consultant is providing to the Company, or because the Consultant is not a natural person, or as otherwise provided by the rules governing the use of Form S-8, unless the Company determines both (i) that such grant (A) shall be registered in another manner under the Securities Act (*e.g.,* on a Form S-3 Registration Statement) or (B) does not require registration under the Securities Act in order to comply with the requirements of the Securities Act, if applicable, and (ii) that such grant complies with the securities laws of all other relevant jurisdictions.

iii) Rule 701 and Form S-8 generally are available to consultants and advisors only if (i) they are natural persons; (ii) they provide bona fide services to the issuer, its parents, its majority-owned subsidiaries or majority-owned subsidiaries of the issuer's parent; and (iii) the services are not in connection with the offer or sale of securities in a capital-raising transaction, and do not directly or indirectly promote or maintain a market for the issuer's securities.

## 6) OPTION PROVISIONS.

Each Option shall be in such form and shall contain such terms and conditions as the Board shall deem appropriate.  All Options shall be separately designated Incentive Stock Options or Nonstatutory Stock Options at the time of grant, and, if certificates are issued, a separate certificate or certificates will be issued for shares of Common Stock purchased on exercise of each type of Option.  The provisions of separate Options need not be identical, but each Option shall include (through incorporation of provisions hereof by reference in the Option or otherwise) the substance of each of the following provisions:

a) **Term.**  Subject to the provisions of subsection 5(b) regarding Ten Percent Shareholders, no Incentive Stock Option shall be exercisable after the expiration of ten (10) years from the date it was granted.

b) **Exercise Price of an Incentive Stock Option.**  Subject to the provisions of subsection 5(b) regarding Ten Percent Shareholders, the exercise price of each Incentive Stock Option shall be not less than one hundred percent (100%) of the Fair Market Value of the Common Stock subject to the Option on the date the Option is granted.  Notwithstanding the foregoing, an Incentive Stock Option may be granted with an exercise price lower than that set forth in the preceding sentence if such Option is granted pursuant to an assumption or substitution for another option in a manner satisfying the provisions of Section 424(a) of the Code.

c) **Exercise Price of a Nonstatutory Stock Option.**  The exercise price of each Nonstatutory Stock Option shall be not less than eighty-five percent (85%) of the Fair Market Value of the Common Stock subject to the Option on the date the Option is granted.  Notwithstanding the foregoing, a Nonstatutory Stock Option may be granted with an exercise price lower than that set forth in the preceding sentence if such Option is granted pursuant to an assumption or substitution for another option in a manner satisfying the provisions of Section 424(a) of the Code.

d) **Consideration.**  The purchase price of Common Stock acquired pursuant to an Option shall be paid, to the extent permitted by applicable statutes and regulations, either (i) in cash at the time the Option is exercised or (ii) at the discretion of the Board at the time of the grant of the Option (or subsequently in the case of a Nonstatutory Stock Option) (1) by delivery to the Company of other Common Stock, (2) according to a deferred payment or other similar arrangement with the Optionholder or (3) in any other form of legal consideration that may be acceptable to the Board.  Unless otherwise specifically provided in the Option, the purchase price of Common Stock acquired pursuant to an Option that is paid by delivery to the Company of other Common Stock acquired, directly or indirectly from the Company, shall be paid only by shares of the Common Stock of the Company that have been held for more than six (6) months (or such longer or shorter period of time required to avoid a charge to earnings for financial accounting purposes).  Payment of the Common Stock's "par value," as defined in the Delaware General Corporation Law, shall not be made by deferred payment.

In the case of any deferred payment arrangement, interest shall be compounded at least annually and shall be charged at the minimum rate of interest necessary to avoid the treatment as interest, under any applicable provisions of the Code, of any amounts other than amounts stated to be interest under the deferred payment arrangement.

e) **Transferability of an Incentive Stock Option.**  An Incentive Stock Option shall not be transferable except by will or by the laws of descent and shall be exercisable during the lifetime of the Optionholder only by the Optionholder.  Notwithstanding the foregoing, the Optionholder may, by delivering written notice to the Company, in a form satisfactory to the Company, designate a third party who, in the event of the death of the Optionholder, shall thereafter be entitled to exercise the Option.

f) **Transferability of a Nonstatutory Stock Option.**  A Nonstatutory Stock Option shall be transferable to the extent provided in the Option Agreement.  If the Nonstatutory Stock Option does not provide for transferability, then the Nonstatutory Stock Option shall not be transferable except by will or by the laws of descent and distribution and shall be exercisable during the lifetime of the Optionholder only by the Optionholder.  Notwithstanding the foregoing, the Optionholder may, by delivering written notice to the Company, in a form satisfactory to the Company, designate a third party who, in the event of the death of the Optionholder, shall thereafter be entitled to exercise the Option.

g) **Vesting Generally.**  The total number of shares of Common Stock subject to an Option may, but need not, vest and therefore become exercisable in periodic installments that

may, but need not, be equal.  The Option may be subject to such other terms and conditions on the time or times when it may be exercised (which may be based on performance or other criteria) as the Board may deem appropriate.  The vesting provisions of individual Options may vary.  The provisions of this subsection 6(g) are subject to any Option provisions governing the minimum number of shares of Common Stock as to which an Option may be exercised.

h) **Termination of Continuous Service.**  In the event an Optionholder's Continuous Service terminates (other than upon the Optionholder's death or Disability), the Optionholder may exercise his or her Option but only within such period of time ending on the earlier of (i) the date twelve (12) months following the termination of the Optionholder's Continuous Service (or such longer or shorter period specified in the Option Agreement), or (ii) the date twelve (12) months following the date of the adoption of the Plan by the stockholders of the Company, or (iii) the expiration of the term of the Option as set forth in the Option Agreement.  If, after termination, the Optionholder does not exercise his or her Option within the time specified in the Option Agreement, the Option shall terminate.

i) **Extension of Termination Date.**  An Optionholder's Option Agreement may also provide that if the exercise of the Option following the termination of the Optionholder's Continuous Service (other than upon the Optionholder's death or Disability) would be prohibited at any time solely because the issuance of shares of Common Stock would violate the registration requirements under the Securities Act, then the Option shall terminate on the earlier of (i) the expiration of the term of the Option set forth in subsection 6(a) or (ii) the expiration of a period of twelve (12) months after the termination of the Optionholder's Continuous Service during which the exercise of the Option would not be in violation of such registration requirements.

j) **Disability of Optionholder.**  In the event that an Optionholder's Continuous Service terminates as a result of the Optionholder's Disability, the Optionholder may exercise his or her Option (to the extent that the Optionholder was entitled to exercise such Option as of the date of termination), but only within such period of time ending on the earlier of (i) the date twelve (12) months following such termination (or such longer or shorter period specified in the Option Agreement) or (ii) the expiration of the term of the Option as set forth in the Option Agreement.  If, after termination, the Optionholder does not exercise his or her Option within the time specified herein, the Option shall terminate.

k) **Death of Optionholder.**  In the event (i) an Optionholder's Continuous Service terminates as a result of the Optionholder's death or (ii) the Optionholder dies within the period (if any) specified in the Option Agreement after the termination of the Optionholder's Continuous Service for a reason other than death, then the Option may be exercised (to the extent the Optionholder was entitled to exercise such Option as of the date of death) by the Optionholder's estate, by a person who acquired the right to exercise the Option by bequest or inheritance or by a person designated to exercise the Option upon the Optionholder's death pursuant to subsection 6(e) or 6(f), but only within the

period ending on the earlier of (1) the date eighteen (18) months following the date of death (or such longer or shorter period specified in the Option Agreement) or (2) the expiration of the term of such Option as set forth in the Option Agreement.  If, after death, the Option is not exercised within the time specified herein, the Option shall terminate.

l) **Early Exercise.**  The Option may, but need not, include a provision whereby the Optionholder may elect at any time before the Optionholder's Continuous Service terminates to exercise the Option as to any part or all of the shares of Common Stock subject to the Option prior to the full vesting of the Option.  Any unvested shares of Common Stock so purchased may be subject to a repurchase option in favor of the Company or to any other restriction the Board determines to be appropriate.  The Company will not exercise its repurchase option until at least six (6) months (or such longer or shorter period of time required to avoid a charge to earnings for financial accounting purposes) have elapsed following exercise of the Option unless the Board otherwise specifically provides in the Option.

m) **Right of Repurchase.**  The Option may, but need not, include a provision whereby the Company may elect, prior to the Listing Date, to repurchase all or any part of the vested shares of Common Stock acquired by the Optionholder pursuant to the exercise of the Option.  The Company will not exercise its repurchase option until at least six (6) months (or such longer or shorter period of time required to avoid a charge to earnings for financial accounting purposes) have elapsed following exercise of the Option unless the Board otherwise specifically provides in the Option.

n) **Right of First Refusal.**  The Option may, but need not, include a provision whereby the Company may elect, prior to the Listing Date, to exercise a right of first refusal in accordance with the terms and conditions of the Option Agreement.

o) **Re-Load Options.**

   i) Without in any way limiting the authority of the Board to make or not to make grants of Options hereunder, the Board shall have the authority (but not an obligation) to include as part of any Option Agreement a provision entitling the Optionholder to a further Option (a "Re-Load Option") in the event the Optionholder exercises the Option evidenced by the Option Agreement, in whole or in part, by surrendering other shares of Common Stock in accordance with this Plan and the terms and conditions of the Option Agreement. Unless otherwise specifically provided in the Option, the Optionholder shall not surrender shares of Common Stock acquired, directly or indirectly from the Company, unless such shares have been held for more than six (6) months (or such longer or shorter period of time required to avoid a charge to earnings for financial accounting purposes).

   ii) Any such Re-Load Option shall (1) provide for a number of shares of Common Stock equal to the number of shares of Common Stock surrendered as part or all of the exercise price of such Option; (2) have an expiration date which is the same as the

expiration date of the Option the exercise of which gave rise to such Re-Load Option; and (3) have an exercise price which is equal to one hundred percent (100%) of the Fair Market Value of the Common Stock subject to the Re-Load Option on the date of exercise of the original Option. Notwithstanding the foregoing, a Re-Load Option shall be subject to the same exercise price and term provisions heretofore described for Options under the Plan.

iii) Any such Re-Load Option may be an Incentive Stock Option or a Nonstatutory Stock Option, as the Board may designate at the time of the grant of the original Option; provided, however, that the designation of any Re-Load Option as an Incentive Stock Option shall be subject to the one hundred thousand dollar ($100,000) annual limitation on the exercisability of Incentive Stock Options described in subsection 10(d) and in Section 422(d) of the Code. There shall be no Re-Load Options on a Re-Load Option. Any such Re-Load Option shall be subject to the availability of sufficient shares of Common Stock under subsection 4(a) and the "Section 162(m) Limitation" on the grants of Options under subsection 5(c) and shall be subject to such other terms and conditions as the Board may determine which are not inconsistent with the express provisions of the Plan regarding the terms of Options.

p) **Forfeiture of Profits.** The Option may, but need not, include a provision whereby the Company may require an Optionholder to pay to the Company the amount of any profits from the sale of the shares subject to the Option in the event the Optionholder violates any proprietary information, inventions, non-solicitation and/or non-competition agreements with the Company.

7) **PROVISIONS OF STOCK AWARDS OTHER THAN OPTIONS.**

a) **Stock Bonus Awards.** Each stock bonus agreement shall be in such form and shall contain such terms and conditions as the Board shall deem appropriate. The terms and conditions of stock bonus agreements may change from time to time, and the terms and conditions of separate stock bonus agreements need not be identical, but each stock bonus agreement shall include (through incorporation of provisions hereof by reference in the agreement or otherwise) the substance of each of the following provisions:

i) **Consideration.** A stock bonus may be awarded in consideration for past services actually rendered to the Company or an Affiliate for its benefit.

ii) **Vesting.** Shares of Common Stock awarded under the stock bonus agreement may, but need not, be subject to a share repurchase option in favor of the Company in accordance with a vesting schedule to be determined by the Board.

iii) **Termination of Participant's Continuous Service.** In the event a Participant's Continuous Service terminates, the Company may reacquire any or all of the shares of Common Stock held by the Participant which have not vested as of the date of termination under the terms of the stock bonus agreement.

iv) **Transferability.**  Rights to acquire shares of Common Stock under the stock bonus agreement shall be transferable by the Participant only upon such terms and conditions as are set forth in the stock bonus agreement, as the Board shall determine in its discretion, so long as Common Stock awarded under the stock bonus agreement remains subject to the terms of the stock bonus agreement.

v) **Forfeiture of Profits.**  A stock bonus agreement may, but need not, include a provision whereby the Company may require a Participant to pay to the Company the amount of any profits from the sale of the shares subject to a stock bonus award in the event the Participant violates any proprietary information, inventions, non-solicitation and/or non-competition agreements with the Company.

b) **Restricted Stock Awards.**  Each restricted stock purchase agreement shall be in such form and shall contain such terms and conditions as the Board shall deem appropriate. The terms and conditions of the restricted stock purchase agreements may change from time to time, and the terms and conditions of separate restricted stock purchase agreements need not be identical, but each restricted stock purchase agreement shall include (through incorporation of provisions hereof by reference in the agreement or otherwise) the substance of each of the following provisions:

i) **Purchase Price.**  The purchase price of restricted stock awards shall not be less than eighty-five percent (85%) of the Common Stock's Fair Market Value on the date such award is made or at the time the purchase is consummated.

ii) **Consideration.**  The purchase price of Common Stock acquired pursuant to the restricted stock purchase agreement shall be paid either:  (i) in cash at the time of purchase; (ii) at the discretion of the Board, according to a deferred payment or other similar arrangement with the Participant; or (iii) in any other form of legal consideration that may be acceptable to the Board in its discretion; provided, however, that at any time that the Company is incorporated in Delaware, then payment of the Common Stock's "par value," as defined in the Delaware General Corporation Law, shall not be made by deferred payment.

iii) **Vesting.**  Shares of Common Stock acquired under the restricted stock purchase agreement may, but need not, be subject to a share repurchase option in favor of the Company in accordance with a vesting schedule to be determined by the Board.

iv) **Termination of Participant's Continuous Service.**  In the event a Participant's Continuous Service terminates, the Company may repurchase or otherwise reacquire any or all of the shares of Common Stock held by the Participant which have not vested as of the date of termination under the terms of the restricted stock purchase agreement.

v) **Transferability.**  Rights to acquire shares of Common Stock under the restricted stock purchase agreement shall be transferable by the Participant only upon such terms and conditions as are set forth in the restricted stock purchase agreement, as the

Board shall determine in its discretion, so long as Common Stock awarded under the restricted stock purchase agreement remains subject to the terms of the restricted stock purchase agreement.

vi) **Forfeiture of Profits.** A stock purchase agreement may, but need not, include a provision whereby the Company may require a Participant to pay to the Company the amount of any profits from the sale of the shares subject to a restricted stock award in the event the Participant violates any proprietary information, inventions, non-solicitation and/or non-competition agreements with the Company.

## 8) COVENANTS OF THE COMPANY.

a) **Availability of Shares.** During the terms of the Stock Awards, the Company shall keep available at all times the number of shares of Common Stock required to satisfy such Stock Awards.

b) **Securities Law Compliance.** The Company shall seek to obtain from each regulatory commission or agency having jurisdiction over the Plan such authority as may be required to grant Stock Awards and to issue and sell shares of Common Stock upon exercise of the Stock Awards; provided, however, that this undertaking shall not require the Company to register under the Securities Act the Plan, any Stock Award or any Common Stock issued or issuable pursuant to any such Stock Award. If, after reasonable efforts, the Company is unable to obtain from any such regulatory commission or agency the authority which counsel for the Company deems necessary for the lawful issuance and sale of Common Stock under the Plan, the Company shall be relieved from any liability for failure to issue and sell Common Stock upon exercise of such Stock Awards unless and until such authority is obtained.

## 9) USE OF PROCEEDS FROM STOCK.

Proceeds from the sale of Common Stock pursuant to Stock Awards shall constitute general funds of the Company.

## 10) MISCELLANEOUS.

a) **Acceleration of Exercisability and Vesting.** The Board shall have the power to accelerate the time at which a Stock Award may first be exercised or the time during which a Stock Award or any part thereof will vest in accordance with the Plan, notwithstanding the provisions in the Stock Award stating the time at which it may first be exercised or the time during which it will vest.

b) **Shareholder Rights.** No Participant shall be deemed to be the holder of, or to have any of the rights of a holder with respect to, any shares of Common Stock subject to such Stock Award unless and until such Participant has satisfied all requirements for exercise of the Stock Award pursuant to its terms.

c) **No Employment or other Service Rights.**   Nothing in the Plan or any instrument executed or Stock Award granted pursuant thereto shall confer upon any Participant any right to continue to serve the Company or an Affiliate in the capacity in effect at the time the Stock Award was granted or shall affect the right of the Company or an Affiliate to terminate (i) the employment of an Employee with or without notice and with or without cause, (ii) the service of a Consultant pursuant to the terms of such Consultant's agreement with the Company or an Affiliate or (iii) the service of a Director pursuant to the Bylaws of the Company or an Affiliate, and any applicable provisions of the corporate law of the state in which the Company or the Affiliate is incorporated, as the case may be.

d) **Incentive Stock Option $100,000 Limitation.**   To the extent that the aggregate Fair Market Value (determined at the time of grant) of Common Stock with respect to which Incentive Stock Options are exercisable for the first time by any Optionholder during any calendar year (under all plans of the Company and its Affiliates) exceeds one hundred thousand dollars ($100,000), the Options or portions thereof which exceed such limit (according to the order in which they were granted) shall be treated as Nonstatutory Stock Options.

e) **Investment Assurances.**   The Company may require a Participant, as a condition of exercising or acquiring Common Stock under any Stock Award, (i) to give written assurances satisfactory to the Company as to the Participant's knowledge and experience in financial and business matters and/or to employ a purchaser representative reasonably satisfactory to the Company who is knowledgeable and experienced in financial and business matters and that he or she is capable of evaluating, alone or together with the purchaser representative, the merits and risks of exercising the Stock Award; and (ii) to give written assurances satisfactory to the Company stating that the Participant is acquiring Common Stock subject to the Stock Award for the Participant's own account and not with any present intention of selling or otherwise distributing the Common Stock. The foregoing requirements, and any assurances given pursuant to such requirements, shall be inoperative if (1) the issuance of the shares of Common Stock upon the exercise or acquisition of Common Stock under the Stock Award has been registered under a then currently effective registration statement under the Securities Act or (2) as to any particular requirement, a determination is made by counsel for the Company that such requirement need not be met in the circumstances under the then applicable securities laws.  The Company may, upon advice of counsel to the Company, place legends on stock certificates issued under the Plan as such counsel deems necessary or appropriate in order to comply with applicable securities laws, including, but not limited to, legends restricting the transfer of the Common Stock.

f) **Withholding Obligations.**   To the extent provided by the terms of a Stock Award Agreement, the Participant may satisfy any federal, state or local tax withholding obligation relating to the exercise or acquisition of Common Stock under a Stock Award by any of the following means (in addition to the Company's right to withhold from any compensation paid to the Participant by the Company) or by a combination of such

means:  (i) tendering a cash payment; (ii) authorizing the Company to withhold shares of Common Stock from the shares of Common Stock otherwise issuable to the Participant as a result of the exercise or acquisition of Common Stock under the Stock Award, provided, however, that no shares of Common Stock are withheld with a value exceeding the minimum amount of tax required to be withheld by law; or (iii) delivering to the Company owned and unencumbered shares of Common Stock.

11) **ADJUSTMENTS UPON CHANGES IN STOCK.**

a) **Capitalization Adjustments**.  If any change is made in the Common Stock subject to the Plan, or subject to any Stock Award, without the receipt of consideration by the Company (through merger, consolidation, reorganization, recapitalization, reincorporation, stock dividend, dividend in property other than cash, stock split, liquidating dividend, combination of shares, exchange of shares, change in corporate structure or other transaction not involving the receipt of consideration by the Company), the Plan will be appropriately adjusted in the class(es) and maximum number of securities subject to the Plan pursuant to subsection 4(a) and the maximum number of securities subject to award to any person pursuant to subsection 5(c), and the outstanding Stock Awards will be appropriately adjusted in the class(es) and number of securities and price per share of Common Stock subject to such outstanding Stock Awards.  The Board shall make such adjustments, and its determination shall be final, binding and conclusive.  (The conversion of any convertible securities of the Company shall not be treated as a transaction "without receipt of consideration" by the Company).

b) **Change in Control--Dissolution or Liquidation**.  In the event of a dissolution or liquidation of the Company, then all outstanding Stock Awards shall terminate immediately prior to such event.

c) **Change in Control--Asset Sale, Merger, Consolidation, Reverse Merger or Acquisition**.  In the event of (i) a sale, lease or other disposition of all or substantially all of the assets of the Company, (ii) a merger or consolidation in which the Company is not the surviving corporation, (iii) a reverse merger in which the Company is the surviving corporation but the shares of Common Stock outstanding immediately preceding the merger are converted by virtue of the merger into other property, whether in the form of securities, cash or otherwise, or (iv) the acquisition (other than from the Company) by any Person, as defined in this Section 11(c), of the beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 50% or more of (A) the then outstanding shares of the securities of the Company, or (B) the combined voting power of the then outstanding securities of the Company entitled to vote generally in the election of the directors, then any surviving corporation or acquiring corporation shall assume any Stock Awards outstanding under the Plan or shall substitute similar stock awards (including an award to acquire the same consideration paid to the shareholders in the transaction described in this subsection 11(c)) for those outstanding under the Plan, as of the effective time of the transaction described in this subsection 11(c) (the "Closing"). In the event any surviving corporation or acquiring corporation refuses to assume such

Stock Awards or to substitute similar stock awards for those outstanding under the Plan as of the effective time of the Closing, then with respect to Stock Awards held by Participants whose Continuous Service has not terminated as of immediately before the Closing, the vesting of such Stock Awards (and, if applicable, the time during which such Stock Awards may be exercised) shall be accelerated immediately before the Closing to include an additional twelve (12) months of vesting, and the Stock Awards shall terminate upon the Closing if not exercised (if applicable) at or prior to the Closing. With respect to any other Stock Awards outstanding under the Plan, such Stock Awards shall terminate upon the Closing if not exercised (if applicable) at or prior to the Closing. Notwithstanding the foregoing, this Section 11(c) shall not apply in the case of any transaction pursuant to which shares of capital stock of the Company are transferred or issued to any trust, charitable organization, foundation, family partnership or other entity controlled directly or indirectly by, or established for the benefit of, Jeffrey D. Greenberg or his immediate family members (including spouse, children, grandchildren, parents, and siblings, in each case to include adoptive relations), or transferred to any such immediate family members. For purposes of this Section 11(c), a "Person" means any individual, entity or group within the meaning of Section 13(d)(3) or 14(d)(2) of the Exchange Act, other than: employee benefit plans sponsored or maintained by the Company and corporations controlled by the Company.

d) **Change in Control--Termination of Continuous Service.**

   i) If the Continuous Service of a Participant is either involuntarily terminated without Cause or is voluntarily terminated for a Good Reason on or within twelve (12) months after the date of a Change in Control under Section 11(c) of the Plan, then the vesting of such Participant's Stock Award at the time of the Change in Control (and, if applicable, the time during which such Stock Award may be exercised) shall be accelerated to include an additional twelve (12) months of vesting.

   ii) Any purported voluntarily termination of the Continuous Service of a Participant for Good Reason shall be communicated by a notice of termination to the Company, and shall state the specific termination provisions relied upon and set forth in reasonable detail the facts and circumstances claimed to provide a basis for such termination.

   iii) If any payment or benefit that the Participant would receive under this Plan when combined with any other payment or benefit he or she receives pursuant to the termination of his employment with the Company (collectively, the "Payment") would (i) constitute a "parachute payment" within the meaning of Section 280G of the Code, and (ii) but for this sentence, be subject to the excise tax imposed by Section 4999 of the Code (the "Excise Tax"), then such Payment shall be either (x) the full amount of such Payment or (y) such lesser amount (with cash payments being reduced before stock compensation) as would result in no portion of the Payment being subject to the Excise Tax, whichever of the foregoing amounts, taking into account the applicable federal, state and local employment taxes, income taxes, and the Excise Tax, results in the Participant's receipt, on an after-tax basis, of the greater

amount notwithstanding that all or some portion of the Payment may be subject to the Excise Tax. Participant shall be solely responsible for the payment of all personal tax liability that is incurred as a result of the payments and benefits received under this Plan or other applicable agreements, and Participant will not be reimbursed by the Company for any such payment.

iv) All determinations required to be made under Section 11(d)(iii) shall be made by the Company's independent public accountants (the "Accountants"). The Accountants shall provide detailed supporting calculations both to the Company and the Participant within thirty (30) business days of the date that the Participant's employment with the Company terminates or such earlier time as is requested by the Company. For purposes of making the calculations required by Section 11(d)(iii), the Accountants may make reasonable assumptions and approximations concerning applicable taxes and may rely on reasonable, good faith determinations concerning the application of the Code. The Company and the Participant shall furnish to the Accountants such information and documents as the Accountants may reasonably request in order to make a determination under Section 11(d)(iii). The Company and Participant shall split evenly all costs the Accountants may reasonably incur in connection with any calculations contemplated by this Section. Any such determination by the Accountants shall be binding upon the Company and Participant. Within thirty (30) days after receipt of the calculations, the Company shall pay to or distribute to or for the benefit of the Participant such amounts as are then due to him or her under this Agreement.

v) As a result of the uncertainty in the application of Section 280G of the Code at the time of the initial determination by the Accountants hereunder, it is possible that a Payment or Payments, as the case may be, will have been made by the Company that should not have been made (the "Overpayment") or that an additional Payment or Payments, as the case may be, which will not have been made by the Company could have been made (the "Underpayment"), in each case, consistent with the calculations required to be made hereunder. In the event that the Accountants, based upon the assertion of the deficiency by the Internal Revenue Service against Participant or the Company that the Accountant believe has a high probability of success, determine that an Overpayment has been made, any such overpayment paid or distributed by the Company to or for the benefit of Participant shall be treated for all purposes as a loan *ab initio* to Participant that he shall repay to the Company together with interest at the applicable federal rate provided for in Section 7872(f)(2) of the Code; *provided, however*, that no such loan shall be deemed to have been made and no amount shall be payable by the Participant to the Company if and to the extent such deemed loan and payment would not either reduce the amount on which the Participant is subject to tax under Section 1 and Section 4999 of the Code or generate a refund of such taxes. In the event that the Accountants, based upon controlling precedent or other substantial authority, determine that an Underpayment has occurred, any such Underpayment shall be promptly paid by the Company to or for the benefit of the

Participant together with interest at the applicable federal rate provided for in Section 7872(f)(2) of the Code.

e) **Change in Control--Securities Acquisition**. After the Listing Date, in the event of an acquisition by any person, entity or group within the meaning of Section 13(d) or 14(d) of the Exchange Act, or any comparable successor provisions (excluding any employee benefit plan, or related trust, sponsored or maintained by the Company or an Affiliate) of the beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act, or comparable successor rule) of securities of the Company representing at least fifty percent (50%) of the combined voting power entitled to vote in the election of Directors and provided that such acquisition is not a result of, and does not constitute a transaction described in, subsection 11(c) hereof, then with respect to Stock Awards held by Participants whose Continuous Service has not terminated, the vesting of such Stock Awards (and, if applicable, the time during which such Stock Awards may be exercised) shall be accelerated to include an additional twelve (12) months of vesting.

## 12) AMENDMENT OF THE PLAN AND STOCK AWARDS.

a) **Amendment of Plan.** The Board at any time, and from time to time, may amend the Plan. However, except as provided in Section 11 relating to adjustments upon changes in Common Stock, no amendment shall be effective unless approved by the shareholders of the Company to the extent shareholder approval is necessary to satisfy the requirements of Section 422 of the Code, Rule 16b-3 or any Nasdaq or securities exchange listing requirements.

b) **Shareholder Approval.** The Board may, in its sole discretion, submit any other amendment to the Plan for shareholder approval, including, but not limited to, amendments to the Plan intended to satisfy the requirements of Section 162(m) of the Code and the regulations thereunder regarding the exclusion of performance-based compensation from the limit on corporate deductibility of compensation paid to certain executive officers.

c) **Contemplated Amendments.** It is expressly contemplated that the Board may amend the Plan in any respect the Board deems necessary or advisable to provide eligible Employees with the maximum benefits provided or to be provided under the provisions of the Code and the regulations promulgated thereunder relating to Incentive Stock Options and/or to bring the Plan and/or Incentive Stock Options granted under it into compliance therewith.

d) **No Impairment of Rights.** Rights under any Stock Award granted before amendment of the Plan shall not be impaired by any amendment of the Plan unless (i) the Company requests the consent of the Participant and (ii) the Participant consents in writing.

e) **Amendment of Stock Awards.** The Board at any time, and from time to time, may amend the terms of any one or more Stock Awards; provided, however, that the rights under any Stock Award shall not be impaired by any such amendment unless (i) the

Company requests the consent of the Participant and (ii) the Participant consents in writing.

### 13) TERMINATION OR SUSPENSION OF THE PLAN.

a) **Plan Term.**  The Board may suspend or terminate the Plan at any time.  Unless sooner terminated, the Plan shall terminate on the day before the tenth (10th) anniversary of the date the Plan is adopted by the Board or approved by the shareholders of the Company, whichever is earlier.  No Stock Awards may be granted under the Plan while the Plan is suspended or after it is terminated.

b)  **No Impairment of Rights.**  Suspension or termination of the Plan shall not impair rights and obligations under any Stock Award granted while the Plan is in effect except with the written consent of the Participant.

### 14) EFFECTIVE DATE OF PLAN.

The Plan shall become effective as determined by the Board, but no Stock Award shall be exercised (or, in the case of a stock bonus, shall be granted) unless and until the Plan has been approved by the shareholders of the Company, which approval shall be within twelve (12) months before or after the date the Plan is adopted by the Board.

### 15) CHOICE OF LAW.

The law of the State of Virginia shall govern all questions concerning the construction, validity and interpretation of this Plan, without regard to such state's conflict of law rules.

*  *  *  *

## Transactis, Inc.

## Amendments to 2003 Equity Incentive Plan

**Transactis, Inc.**

**2003 Equity Incentive Plan**

**Amendment No. 1**

The Company's 2003 Equity Incentive Plan ("Plan") is hereby amended as set forth below.

Section 4(a) of the Plan is hereby deleted in its entirety and replaced with the following:

"(a)   **Share Reserve**.  Subject to the provisions of Section 11 relating to adjustments upon changes in Common Stock, the Common Stock that may be issued pursuant to Stock Awards shall not exceed in the aggregate Two Million Four Hundred Forty Four Thousand Four Hundred Fifty Seven (2,444,457) shares of Common Stock."

Except as expressly modified by this amendment, the provisions of the Plan shall remain in full force and effect in accordance with their terms.

\*   \*   \*

**Adopted by the Stockholders**:  March 15, 2007

**Transactis, Inc.**

**2003 Equity Incentive Plan**

**Amendment No. 2**

The Company's 2003 Equity Incentive Plan ("Plan") is hereby amended as set forth below.

Section 4(a) of the Plan is hereby deleted in its entirety and replaced with the following:

"(a)   **Share Reserve**.  Subject to the provisions of Section 11 relating to adjustments upon changes in Common Stock, the Common Stock that may be issued pursuant to Stock Awards shall not exceed in the aggregate Three Million Four Hundred Forty Four Thousand Four Hundred Fifty Seven (3,444,457) shares of Common Stock."

Except as expressly modified by this amendment, the provisions of the Plan shall remain in full force and effect in accordance with their terms.

\*   \*   \*

**Adopted by the Stockholders**:  March 17, 2008

**Transactis, Inc.**

**2003 Equity Incentive Plan**

**Amendment No. 3**

The Company's 2003 Equity Incentive Plan ("Plan") is hereby amended as set forth below.

1. Section 4(a) of the Plan is hereby deleted in its entirety and replaced with the following:

"(a)   **Share Reserve**.  Subject to the provisions of Section 11 relating to adjustments upon changes in Common Stock, the Common Stock that may be issued pursuant to Stock Awards shall not exceed in the aggregate ten million nine hundred forty five thousand (10,945,000) shares of Common Stock."

2. Section 6(h) of the Plan is hereby deleted in its entirety and replaced with the following:

"(h)   **Termination of Continuous Service**.  In the event an Optionholder's Continuous Service terminates (other than upon the Optionholder's death or Disability), the Optionholder may exercise his or her Option (to the extent vested) but only within such period of time ending on the earlier of (i) the date 90 days following the termination of the Optionholder's Continuous Service (or such longer or shorter period specified in the Option Agreement), or (ii) the expiration of the term of the Option as set forth in the Option Agreement; provided that individual Option Agreements may specify otherwise.  If, after termination, the Optionholder does not exercise his or her Option within the time specified herein or in the Option Agreement, then the Option shall terminate and be forfeit in its entirety."

3. Section 11(d)(i) of the Plan is hereby deleted in its entirety and replaced with the following:

"(i)   If the Continuous Service of a Participant is either involuntarily terminated without Cause or is voluntarily terminated for a Good Reason on or within 60 days after the date of a Change of Control under Section 11(c) of the Plan, then the vesting of such Participant's Stock Award at the time of the Change of Control (and, if applicable, the time during which such Stock Award may be exercised) shall be accelerated to include an additional twelve (12) months of vesting."

\* \* \*

**Adopted by the Stockholders**: January 29, 2009

**Transactis, Inc.**

**2003 Equity Incentive Plan**

**Amendment No. 4**

The Company's 2003 Equity Incentive Plan ("Plan") is hereby amended as set forth below.

1.  Section 4(a) of the Plan is hereby deleted in its entirety and replaced with the following:

"(a)   **Share Reserve**.   Subject to the provisions of Section 11 relating to adjustments upon changes in Common Stock, the Common Stock that may be issued pursuant to Stock Awards shall not exceed in the aggregate one million five hundred ninety thousand two hundred seventy nine (1,590,279) shares of Common Stock."

\* \* \*

**Adopted by the Stockholders**: August 24, 2010

**Transactis, Inc.**

**2003 Equity Incentive Plan**

**Amendment No. 5**

The Company's 2003 Equity Incentive Plan ("Plan") is hereby amended as set forth below.

1.  Section 4(a) of the Plan is hereby deleted in its entirety and replaced with the following:

"(a)     **Share Reserve**.   Subject to the provisions of Section 11 relating to adjustments upon changes in Common Stock, the Common Stock that may be issued pursuant to Stock Awards shall not exceed in the aggregate two million, four hundred fifty thousand, six hundred and fifty (2,450,650) shares of Common Stock."

\* \* \*

**Adopted by the Stockholders**: November 17, 2010

**Transactis, Inc**

**2003 Equity Incentive Plan**

**Amendment No. 6**

The Company's 2003 Equity Incentive Plan ("Plan") is hereby amended as set forth below:

1.      Section 11(d)(i) of the Plan is hereby deleted in its entirety and replaced with the following:

"(i)  If the Continuous Service of a Participant is either involuntarily terminated without Cause or is voluntarily terminated for a Good Reason as the result of or any time prior to the first anniversary after the date of a Change of Control under Section 11(c)  of the Plan, then the vesting of such Participant's Stock Award at the time of the Change of Control (and, if applicable, the time during which such Stock Award may be exercised) shall be accelerated to include all additional options subject to vesting under the Stock Award."

"(ii) If a Participant continues to remain employed by the Company or its successor for a period up to the first anniversary after the date of a Change of Control under Section 11(c) of the Plan ("First Anniversary"), then the vesting of such Participant's Stock Award at the First Anniversary (and, if applicable, the time during which such Stock Award may be exercised) shall be accelerated to include all additional options subject to vesting under the Stock Award."

\* \* \* \* \* \*

**Adopted by the Board of Directors:**      October 25, 2011

**Adopted by the Stockholders:**      October 26, 2011

**Transactis, Inc.**

**Amendment to 2003 Equity Incentive Plan**

**November __, 2012**

Section 4(a) of the Transactis, Inc. 2003 Equity Incentive Plan (the "*Plan*") is hereby deleted in its entirety and replaced with the following:

"(a)   **Share Reserve**.   Subject to the provisions of Section 11 relating to adjustments upon changes in Common Stock, the Common Stock that may be issued pursuant to Stock Awards shall not exceed in the aggregate Two Million Six Hundred Sixty Eight Thousand Five Hundred Eighty Five (2,668,585) shares of Common Stock."

\*   \*   \*